

Louis V. Fasulo, Esq.– NY & NJ
Samuel M. Braverman, Esq.– NY & NJ
Charles Di Maggio, Esq.– NY & MA

www.FBDMLaw.com
SBraverlaw@fbdmlaw.com

MEMO ENDORSED

April 22, 2020

Hon. Kenneth M. Karas
United States District Judge
United States Courthouse
300 Quarropas Street
White Plains, New York 10601

Re:     *United States v. Christopher Martinez (U.S. v. Sargeant)*
Dkt.    19 Cr 666

Dear Judge Karas:

This office represents the defendant Christopher Martinez in the above-captioned case. Mr. Martinez remains detained at the Westchester County Jail in Valhalla, New York ("WCJ") pending trial after he was detained at a prior proceeding. The Government seeks continued detention on the grounds of risk of flight and danger to the community in this, a presumption case. Trial in this matter has not been set, and the next appearance before this Court is set for June 11, 2020.

Information now exists that was not known at the time of Mr. Martinez's last court appearance "that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of [Mr. Martinez] as required and the safety of the community." *See* 18 U.S.C. § 3142(f). I write now to request the court grant temporary release, with such other conditions as the Court deems just and necessary, under 18 U.S.C. § 3142(i), because such release is "necessary for preparation of the [Mr. Martinez]'s defense" and for other "compelling reason[s]." 18 U.S.C. § 3142(i); *See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in a bail application); see also U.S. v. Dante Stephens, 15 Cr. 95 (AJN), ECF No. 2798: Opinion & Order dated March 18, 2020 (finding under § 3142(i) that the current lockdown and denial of counsel visits were sufficient compelling reasons for release of an inmate before her charged with a serious and violent felony (there "having a loaded firearm in proximity to guns")).

Here, the compelling reasons are threefold: (1) Mr. Martinez, like all other inmates at WCJ, is at heightened risk for contracting and spreading the COVID-19 virus due directly to his

1

conditions of confinement; (2) the Bureau of Prisons' agent WCJ's near total lockdown, in conjunction with his counsel's inability to get to the jail due to the pandemic, is substantially diminishing Mr. Martinez access to counsel, and (3) Mr. Martinez has multiple, significant medical conditions that makes him at greater risk to the coronavirus if he were to become infected, a substantial likelihood in the confined quarters of the WCJ.

The Bail Reform Act requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial."[1] Pretrial release "permits the unhampered preparation of a defense," "serves to prevent the infliction of punishment prior to conviction," and protects the presumption of innocence.[2] Under the Bail Reform Act, a court may order a defendant released on his/her own recognizance, or if the Court deems necessary, with the least restrictive condition, or combination of conditions, to reasonably assure the appearance of the defendant and the safety of the community.[3] Only if the Court finds that no conditions will reasonably assure the defendant's appearance or the safety of the community should the Court order the defendant detained prior to trial.[4]

I propose that Mr. Martinez be released temporarily subject to conditions of home incarceration and electronic monitoring and a substantial bond, subject to a 14-day isolation quarantine, that would substantially reduce the risk of flight and the risk of danger to the community during the COVID-19 crisis. If this Court grants a temporary bail, it could review the bail decision again when the danger of the virus has concluded.

This motion is further predicated on Mr. Martinez' civil right to medical care, safe detention, and access to his defense counsel, as required by BOP policy, state and federal law, the New York State Constitution, the United States Constitution, 18 USC §242, and 42 USC §1983.

Westchester County Jail is an entity of state law, charged with the detention and care of inmates ordered detained by state courts, and under a contract with the United States government with federal inmates similarly ordered detained by orders of judges of the Southern District of New York, White Plains vicinage. Therefore, it acts under color of law.

The United States, as a party, has prosecuted numerous members of state or federal correctional staff for their failure to provide medical attention to inmates in their custody, regardless of whether those inmates were ordered held pursuant to state or federal orders, regardless of whether those institutions were state or federally operated, and regardless of whether those officers were state or federal employees. 18 USC §242, as pleaded in those complaints states a violation when:

[1] *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No 98-255 at 7, as reprinted in 1984 U.S.C.C.A.N. 3182, 3189).
[2] *Stack v. Boyle*, 342 U.S. 1, 4 (1951).
[3] *See* 18 U.S.C. § 3142(c)(1)(b).
[4] *See id.* at § 3142(e)(1).

2

225 Broadway, Suite 715          505 Eighth Avenue, Suite 300          Post Office Box 127
New York, New York 10007         New York, New York 10018            Tenafly, New Jersey 07670
Tel (212) 566-6213               Tel (212) 967-0352                  Tel (201) 569-1595
Fax (212) 566-8165               Fax (201) 596-2724                  Fax (201) 596-2724

A person, under color of law, statute, ordinance, regulation, and custom, willfully subjects a person in a State, to wit, the State of New York, to the deprivation of a right, privilege, and immunity secured and protected by the Constitution and the laws of the United States, to wit, the right to be free from deliberate indifferences to a serious medical need, which deprivation results in bodily injury to a person, or their death.

(See, e.g., *United States for Terrence Pendergrass*, 14 Cr 329 (RA) (Braverman, S. for the accused)).

Therefore, since WCJ has the statutory duty to provide medical care to Mr. Martinez, and Mr. Martinez has a constitutional right to medical care, and WCJ is on notice of both the acute medical conditions suffered by Mr. Martinez and the presence of the potentially fatal coronavirus in its institution, and WCJ has failed to provide the required the scientifically required prevention actions to stop the spread of the coronavirus, WCJ should be ordered to appear before this Court and give evidence of its deficiencies, and be subject to oversight by this Court and an overseer to be appointed by this Court to insure compliance.

**1.      Mr. Martinez should be granted temporary release because his presence at WCJ heightens the risk of infection to himself, other inmates at WCJ, WCJ staff, and the New York City community.**

New York City is facing a serious and urgent public health crisis.[5] On March 11, 2020, the World Health Organization officially classified COVID-19, the respiratory illness caused by a novel strain of coronavirus, as a global pandemic.[6] On March 13, 2020 the President of the United States declared a national State of Emergency. In response to this public health crisis in this state, Gov. Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[7] Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020.[8] On March 20, 2020, Governor Cuomo directed all non-essential workers to work from

---

[5] I gratefully acknowledge some of the research for this section and the arguments in support thereof, which applies generally to federal inmates, was conducted by my gifted colleagues at the Federal Defenders of New York. However, the numbers of victims in the outbreak increase so quickly that they are outdated within hours.
[6] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.
[7] At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.
[8] DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned, The New York Times (Mar. 12, 2020).

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

home, requiring individuals to maintain six feet of distance between each other.[9] The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[10]

Infections are increasing at an exponential rate. On January 21, 2020, Washington State announced the first confirmed case in the United States.[11] Two months later, COVID-19 had infected over 41,701 people across the United States, leading to at least 537 deaths.[12] A month later, as of this morning, there were 834,340 cases and 42,501 deaths. By the end of this month, there will have been more deaths from COVID-19 in three months than the United States sustained in 15 years of foreign war in Vietnam.

The first case of coronavirus in New York State was announced on March 1, 2020. Less than two weeks later, New York State reported 325 positive cases. Ten days later, the state had amassed 30,811 confirmed cases of the virus, with 285 deaths.[13] In a five-day period between March 15 and March 20, New York State experienced a ten-fold increase in new confirmed cases of COVID-19.[14] As of March 25, 2020 in New York City, there were 17,857 positive cases and 199 deaths resulting from the virus (an increase of more than 3,000 cases and 60 deaths in just 33 hours.)[15] Today those numbers had swelled to 257,246 infected people and 15,302 lost souls.[16] And the estimates suggest that the number of infections that have not yet been identified may be 100 or 1000 times greater than presently known.[17] More than 95% of New York's cases are in the Southern and Eastern Districts of New York, an area just 225 miles across.  New York City is *the* epicenter of the US pandemic.[18]

---

[9] Novel Coronavirus (COVID-19)*,* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[10] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[11] First Patient With Wuhan Coronavirus Is Identified in the U.S., The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.

[12] See Coronavirus Map: Tracking the Spread of the Outbreak, The New York Times (March 25, 2020), at https://nyti.ms/2t6WE75 (updating regularly).

[13] Id.

[14] Watch How the Coronavirus Spread Across the United States, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.

[15] Coronavirus, New York City Health (Mar. 25, 2020 at 5:09pm), at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf (updating regularly).

[16] Coronavirus, New York City Health (April 23, 2020 at 11:48am), at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states

[17] Benedict Carey and James Glanz, "Hidden Outbreaks Spread through U.S. Far Earlier Than Americans Knew, Estimates Say", NYTimes.com, April 23, 2020, https://www.nytimes.com/2020/04/23/us/coronavirus-early-outbreaks-cities.html?action=click&module=Spotlight&pgtype=Homepage

[18] Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

4

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

In response to this crisis, I have closed my own physical office and my employees are working from home. Of my six employees, one was furloughed due to the economic downturn, one left for graduate school and has to be replaced, one is pregnant and should not enter the jail, and one's wife just gave birth to their child and therefore should not enter the jail. That leaves only one paralegal, a part-time paralegal, my partner Louis Fasulo, and me to tend to more than 60 clients. Anything that impedes attorney-client communication is a serious conflict with the Sixth Amendment, and the virus outbreak in New York is no exception. If Mr. Martinez is released, on the other hand, each of us could connect with him over a 12-hour day, 7 days a week, by telephone or videoconferencing that fits our schedule, not the schedule of the BOP or WCJ.

According to the Centers for Disease Control and Prevention (CDC), nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[19] In New York, 18- to 49-year-olds comprise more than half of all cases in the state. In New York City, 57% of patients are male.[20] With scores of thousands of confirmed cases in New York City and that number increasing by thousands of cases per day, we must take every necessary action to protect vulnerable populations and the community at large. Recent clinical research indicates that the most common comorbidities were hypertension, obesity, and diabetes.[21] Mr. Martinez has that and more against him.

Prior to the dramatic expansion of cases in the United States, the warning signs of a pandemic were obvious and publicly debated, yet ultimately, they were unheeded.[22] So, again are these specific warnings about an explosion of the virus in the prison populations. We must not miss this opportunity as well.

    a.    **Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus, especially for someone like Christopher Martinez**

"Prisons are petri dishes for contagious respiratory illnesses."[23] Inmates cycle in and out of BOP pretrial facilities from all over the world and the country, and people who work in the

---

[19] Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S., The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[20] See NYC Dept' of Health Daily Data, March 23, 2020, available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.

[21] Safiya Richardson, M.D., M.P.H., "Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area", JAMA (April 22, 2020) https://jamanetwork.com/journals/jama/fullarticle/2765184

[22] David Sanger, Eric Lipton, Eileen Sullivan and Michael Crowley Before Virus Outbreak, a Cascade of Warnings Went Unheeded, New York Times (March 19, 2020) https://www.nytimes.com/2020/03/19/us/politics/trump-coronavirus-outbreak.html?action=click&module=RelatedLinks&pgtype=Article

[23] Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. See also Joseph A. Bick (2007). Infection Control in Jails and Prisons. Clinical Infectious Diseases 45(8):1047-1055, at https://doi.org/10.1086/521910.

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
| --- | --- | --- |
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

facilities leave and return daily, without screening or testing. In a state county jail, such as WCJ, the population is even more transient, the funds to care for inmates even more limited, and general health conditions even worse than at BOP facilities. On March 21, 2020, an inmate at Metropolitan Detention Center (MDC) tested positive for the coronavirus.[24] The individual "complained of chest pains on Thursday, a few days after he arrived at the facility."[25] When he first arrived at the facility, according to authorities, he was asymptomatic. The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island publicly cautioned, "[a] storm is coming."[26] Things at Riker's Island, a jail more similar to WCJ than it is different, has made strides to reduce its inmate population, which would in turn reduce the need for full staffing, but the crisis is still present.[27]

Mr. Martinez's personal situation at WCJ is not good, and he is at high-risk for severe complications if he were to develop COVID-19 because of his systemic medical conditions. Currently, he is in a 1-man cell, where his food is brought to him by other inmates, and he is supervised by WCJ staff. He suffers from high blood pressure, which is measured every day and he is prescribed medication. He is struggling with his diabetes as he is normally on a diet meal to limit his sugar intake, but because of the current conditions, he is being fed the standard meal of white bread, white rice, and potatoes, all of which negatively affect his diabetes. He had commissary money to buy brown rice, but doesn't currently. He does not like asking his family for money as they do not have it, so there are times where he has to eat food which he knows will negatively affect his diabetes. He has bradycardia (a slow heart rate), which in and of itself it not always fatal, but combined with the hypertension and the diabetes, it can be extremely dangerous, and made worse by a respiratory illness that substantially reduces oxygen intake.[28] He has asthma and is taking cough medicine and a decongestant to assist with his breathing. He has trouble breathing currently due to the air in the jail being dirty, and so he has been prescribed an antibiotic to help his lungs. He currently receives his asthma pump only twice-a-day, when the medical cart makes its rounds, and he is not allowed to keep the pump with him for emergencies. He received a new face mask last Friday, but they are only temporary-use masks meant for one use, and he has limited ability to wash them due to the shortage of soap in the jail (see below).

The consequence of these medical conditions *vis-à-vis* the coronavirus, is that when he suffers from his current conditions, his immune system is compromised by the battle it wages every day to keep him alive. Since he certainly has been exposed to the coronavirus in his current environment, if he were to actually get infected (assuming he has not yet been infected, an assumption based upon no facts since WCJ does not actually test anyone prior to the display of the most significant COVID-19 symptoms), his body will be substantially impaired in its ability

[24] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.
[25] *Id.*
[26] 'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.
[27] Michael Barbaro and Megan Twohey, "Getting Off Rikers Island", NYTimes.com (April 23, 2020) https://www.nytimes.com/2020/04/23/podcasts/the-daily/jails-inmates-coronavirus.html
[28] https://www.uofmhealth.org/health-library/aa107571

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

to fight a second infection due to his first infection, increasing his chance of fatal complications. Since the WCJ can't prevent Mr. Martinez from getting COVID-19, he must be released to prevent his needless suffering and potential fatality.

The Center for Disease Control endorses this generally accepted theory, as explained in "Centers for Disease Control and Prevention: Vaccine Recommendations and Guidelines for the Advisory Committee on Immunization Practices" [29], where it advises medical professionals about administering vaccines, containing either live vaccines or inactivated ones. Since the COVID-19 Mr. Martinez would contract would be a live virus that has not be incapacitated in the form of a vaccine, but rather is in its most aggressive state (i.e., "virulent"), the attack on Mr. Martinez's person by the coronavirus would be the most complicated medically it could be. The CDC writes:

> Determination of altered immunocompetence is important to the vaccine provider because *incidence or severity of some vaccine-preventable diseases is higher in persons with altered immunocompetence*; therefore, certain vaccines (e.g., inactivated influenza vaccine, pneumococcal vaccines) are recommended specifically for persons with these diseases (*2,3*). Administration of live vaccines might need to be deferred until immune function has improved. *This is primarily a safety concern, because persons who have altered immunocompetence and receive live vaccines might be at increased risk for an adverse reaction because of uninhibited growth of the attenuated live virus or bacteria. Vaccines might be less effective during the period of altered immunocompetence.* Inactivated vaccines might best be deferred during a period of altered immunocompetence; in this circumstance, the concern is with effectiveness and not safety. Additionally, if an inactivated vaccine is administered during the period of altered immunocompetence, it might need to be repeated after immune function has improved.

> *The degree of altered immunocompetence in a patient should be determined by a physician. The challenge for clinicians and other health-care providers is assessing the safety and effectiveness of vaccines for conditions associated with primary or secondary immunodeficiency, especially when new therapeutic modalities are being used and information about the safety and effectiveness of vaccines has not been characterized fully in persons receiving these drugs (Table 8-1)*. Laboratory studies can be useful for assessing the effects of a disease or drug on the immune system. Tests useful to assess humoral immunity include immunoglobulin (and immunoglobulin subset) levels and specific antibody levels (e.g., tetanus and diphtheria). Tests that demonstrate the status of cellular immunity include lymphocyte numbers (i.e., a complete blood count with differential), a test that delineates concentrations and proportions of lymphocyte subsets (i.e., B and T lymphocytes, CD4+ B lymphocytes versus CD8+ T lymphocytes), and tests that measure T-cell proliferation or function in

---

[29] https://www.cdc.gov/vaccines/hcp/acip-recs/general-recs/immunocompetence.html

7

225 Broadway, Suite 715          505 Eighth Avenue, Suite 300          Post Office Box 127
New York, New York 10007          New York, New York 10018          Tenafly, New Jersey 07670
Tel (212) 566-6213               Tel (212) 967-0352                 Tel (201) 569-1595
Fax (212) 566-8165               Fax (201) 596-2724                 Fax (201) 596-2724

response to specific or nonspecific stimuli (e.g., lymphocyte proliferation assays) (*4,5*). The ability to characterize a drug or disease condition as affecting cellular or humoral immunity is only the first step; *using this information to draw inferences about whether particular vaccines are indicated or whether caution is advised with use of live or inactivated vaccines is more complicated and might require consultation with an infectious diseases or immunology specialist.*

(*Emphasis supplied*).

The very situation that Mr. Martinez is in is the very concern raised by the CDC, and is part of the compelling reasons that Mr. Martinez should be released.

Another of my clients, Devon Knight, described his conditions at WCJ a week ago as follows:

1. 8 inmates total have been removed from Mr. Knight's tier at the WCJ for symptoms consistent with COVID-19, and 5 of those have tested positive (out of 44 inmates on his tier), this despite that his tier has been on quarantine for more than 14 days, strongly suggesting both that the source of new infections is not the inmates themselves in the first instance but rather the staff and inmates serving as trustees, and that mere quarantine is insufficient to stop the spread of the coronavirus;

2. New inmates have been placed into Mr. Knight's tier, some from other tiers in WCJ, but at least one from outside the WCJ, at least one of whom subsequently tested positive for the coronavirus;

3. One small, "hotel" bar of soap is handed out to the inmates on Monday of each week, to be used for all cleaning, including hands, body, cell, masks, and clothing. Since there is no access to the commissary during the lockdown, inmates cannot purchase additional or larger bars of soap. There is no cleaning by WCJ of the individual cells, despite the daily introduction of foreign objects into the cell by way of meal service, prepared and handled but untested but potentially contagious individuals;

4. Only recently have the inmates been issued masks and been required to wear them, but they often take them off when speaking on the telephones and video conferences, as has been observed in other inmates moving around behind Mr. Knight and other inmates during the video conferences I have participated in;

5. The officers are also inconsistent in their continuous wearing of masks during their interaction with the inmates, some wearing the masks all the time, some part of the time, and some officers none of the time they interact with inmates;

6. I have sent inmates copies of their non-video/audio discovery, but it has not been provided to them, nor have they been given access to the library or computer review during the lockdown so that they could review the video/audio discovery in this case;

8

**225 Broadway, Suite 715**
**New York, New York 10007**
**Tel (212) 566-6213**
**Fax (212) 566-8165**

**505 Eighth Avenue, Suite 300**
**New York, New York 10018**
**Tel (212) 967-0352**
**Fax (201) 596-2724**

**Post Office Box 127**
**Tenafly, New Jersey 07670**
**Tel (201) 569-1595**
**Fax (201) 596-2724**

7.  Inmates allowed to make a phone call from time to time, at the whim and kindness of an officer, but at unpredictable times so that I am never assured that when he can make a call I am available to speak with him to discuss his legal options and strategy;

The illusion that the WCJ staff will be able to keep the virus out of the jail, or to sequester it once it gets inside, is totally unrealistic and futile. Coronavirus is highly contagious. On average, one person in the at-large civilian population with the coronavirus will infect between two to three other individuals.[30] But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe" which makes "infection control challenging in these settings."[31]

Internationally, prisons have spawned rapid spread of COVID-19. In China, officials confirmed 500 cases in prisons.[32] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[33] Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[34] Why should inmates in American jails be given any less decency? Shouldn't we hold ourselves to the highest standards?

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[35] One day later, on March 21, 2020, it became clear that no fewer than 38 people tested positive.[36] At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[37] But the cases are not abating. The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[38] The New York City Bar Association has called on "all actors in the criminal justice system" to

---

[30] The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[31] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[32] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[33] Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[34] Jennifer Hansler and Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020), at   https://cnn.it/2W4OpV7.

[35] 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[36] Id.

[37] Id.

[38] Id.

225 Broadway, Suite 715        505 Eighth Avenue, Suite 300        Post Office Box 127
New York, New York 10007       New York, New York 10018            Tenafly, New Jersey 07670
Tel (212) 566-6213             Tel (212) 967-0352                  Tel (201) 569-1595
Fax (212) 566-8165             Fax (201) 596-2724                  Fax (201) 596-2724

"swiftly move to reduce the density at all New York City area jails and prisons to prevent or slow the spread of the virus."39 Notwithstanding this awareness of the problem, the BOP is doing too little and too late.

### b.      The WCJ remains unprepared for a coronavirus outbreak.

The Federal Defenders of New York has stated that the BOP legal department had reported to them a few weeks that BOP had confirmed its first case of COVID-19 infection. Last week, there were dozens. In the context of the coronavirus, where there is one case, there are 100, and where there are dozens, there are likely a thousand. Given that testing at the jail is nearly non-existent, and testing itself only tells the test-giver what the status *was for the one person being tested and at the time of the test* (results typically take 5-7 days), the data is completely insufficient to give anyone any confidence in its conclusion. However, outside journalistic sources are reporting that the problems in the New York metro area jails are just beginning to become obvious. New York City Department of Corrections facility at Riker's Island reports spreading infections among inmates and staff.40 The BOP imposed a 14-day quarantine for all new inmates at its facilities, but of course that does nothing for those who are already behind the walls.41

Inmates at the WCJ -- a substantial pretrial detention facility housing hundreds of people -- are at grave risk of contracting the virus.42 The medical care at the WCJ has repeatedly failed to adequately address even routine medical conditions43 and in times of crisis, medical care at the facility has halted entirely. Clients have repeatedly told me over the years about how when there is a lockdown at the WCJ, there are no sick-calls, no doctors rounds, and no medication delivery. One prior client before this Court with a cardiac condition told me that once he lay on his bed in his locked cell with chest pain, calling for help, for more than 6 hours.

On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities. But prohibiting visits to correctional facilities is insufficient to stop the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and

---

39 See Statement of the New York City Bar Association Urging Immediate Steps to Reduce Prison and Jail Populations to Prevent Spread of the Covid-19 Virus at 2-3, available at https://s3.amazonaws.com/documents.nycbar.org/files/COVID_Prisons_Jails_Statement_FINAL.pdf
40 Ben Chappman, Coronavirus Spreads Among Rikers Inmates, Staff, Wall Street Journal (March 25, 2020). Attached exhibits and at https://www.wsj.com/articles/coronavirus-spreads-among-rikers-inmates-staff-11585093154
41 Sallie Gurman, Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus, Wall Street Journal (March 24, 2020). Attached exhibits and at https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075
42 See U.S. v. Shakeil Martinez, 19 Cr. 867 (PAC) ECF No. 16 at 12-22 (S.D.N.Y. March 23, 2020): Affidavit of Jonathan Giftos, M.D. (hereinafter "Giftos Affidavit").
43 See e.g., National Association of Women Judges (NAWJ) Women in Prison Committee (WIP) Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York, June 3, 2016, at https://bit.ly/39JRhdW.

10

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."44

To prevent new infections, the CDC strongly recommends (1) thorough and frequent handwashing, (2) cleaning surfaces with Environmental Protection Agency approved disinfectants, (3) keeping at least six feet of space between people, and (4) social distancing.45

To date, the WCJ has not met the most basic recommendations of the CDC for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where many individuals are double-bunked in a single cell, sharing a toilet and sink with a cellmate and a common shower with at least sixteen other people, or in a dormitory with 30 other people sharing just a few toilets and a few commons showers. Even the inmate in a one-man cell is vulnerable due to the general lack of hygiene in the jail, and the necessary interaction with other inmates and staff to get medication, food, and soap. In the days since March 13, the WCJ has abandoned its obligation to the inmates for proper hygiene and any attempts to keep the facility safe and clean.

In addition to unhygienic living conditions, frequent movement between units at the WCJ over the past several weeks will spread the virus. In New York City jails, where there have been at least 38 confirmed cases of coronavirus, the Board of Correction chairwoman stated, "[i]t is likely that these people have been in hundreds of housing areas and common areas over recent weeks and have been in close contact with many other people in custody and staff."46 The WCJ will encounter the same obstacle to cabining the spread.

The WCJ's solution curtailing all visits for 30 days creates yet another public health hurdle. Before the current complete isolation from the outside world, the inmates only contact with their families were the common telephones. But with the extra phone time comes swarms of crowds. The phones in Mr. Martinez's unit are in constant use (when they are allowed to call) and were inadequately cleaned, creating more opportunity to spread infection. WCJ has solved that problem by prohibiting their use entirely.

With each additional new arrest comes increased risk of spreading the virus in WCJ. Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility. There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: The individual who tested positive for coronavirus at the MDC on March 21,2020 was first incarcerated only a few short

---

44 Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.
45 See Giftos Affidavit.
46 38 positive for coronavirus in NYC jails, including Rikers, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

225 Broadway, Suite 715          505 Eighth Avenue, Suite 300          Post Office Box 127
New York, New York 10007         New York, New York 10018           Tenafly, New Jersey 07670
Tel (212) 566-6213               Tel (212) 967-0352                 Tel (201) 569-1595
Fax (212) 566-8165               Fax (201) 596-2724                 Fax (201) 596-2724

days before becoming symptomatic.[47] By the time he was segregated, he has been in contact with more than 100 other people.

Notwithstanding many confirmed cases of coronavirus at MDC, the WCJ remains unprepared for an outbreak. According to the Federal Defenders, the facility does not currently have the capability to regularly test for coronavirus and there are no screening protocols in place beyond daily temperature taking and looking for the highly symptomatic. Only if an inmate self-reports symptoms will he be screened for the virus. If symptomatic, the inmate will be "isolated" in his cell, exposing cellmates to risk, or moved to another area of segregation. But his movement will be by the very guards who will continue to be in contact with the hundreds of other prisoners still in the facility.

This Court should at a minimum inquire of the BOP and WCJ how it intends to resolve the following essential questions about its ability to safeguard the individuals in its care:

- Under what circumstances will staff and people incarcerated in the facilities be tested for the virus? How many tests are needed? How will staff and inmates be arranged while test results are pending?

- If people who are incarcerated require quarantine and/or treatment, how will that be accomplished? Can it be accomplished in a humane way and within Constitutional parameters?

- If medical staff must be quarantined or become ill, how will the facility monitor, quarantine and treat the prison or jail population?

- If correctional staff must be quarantined or become ill, how will the facility operate, both in terms of addressing the virus and in terms of simply maintaining necessary services, safety, and security?

- If incarcerated people must be quarantined or become ill, how will the facility continue necessary operations that are reliant on the prison or jail population, such as food preparation?

- How are particularly vulnerable populations, such as the elderly, or immunocompromised, being protected?

- How will the facility meet the challenges of COVID-19 without violating the rights of the people in its custody?

Given what we know about coronavirus, conditions of confinement generally, and the lack of preparedness at the WCJ, the fact that there are just a few publicly confirmed cases of COVID-19 to date at the WCJ reflects the fact that the WCJ lacks the ability to test for the virus.

---

[47] See 1st fed inmate tests positive for coronavirus, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

It does not mean that only a few in the facility are infected. What WCJ disclosed to the public and what it was compelled to disclose to the Court has been broadly divergent, and not honestly so. It is obvious to all that lack of any public declaration about positive tests does not mean that there have been a lack of positive tests. U.S. Sen. Rand Paul (a *former medical doctor*) hid his positive test for coronavirus for 6 days, during which he interacted with hundreds of civilians, public officials, members of his staff and security detail, and mislead the general public about his condition and the spread of the pandemic.[48] At the point when the citizens cannot trust their public servants and medical professionals to have the public's best interests at heart, the Court become the last hope for justice and transparency.[49]

> **c.** **The federal judiciary has begun to set bail conditions for previously detained individuals in light of the coronavirus.**

The judiciary has recently begun to recognize and address this crisis. On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the community" -- the staff and inmates inside the jail—by potentially bringing the virus into the facility. See United States v. Raihan, 20-CR-68 (BMC) (Mar. 12, 2020). A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed a prior bail decision "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." U.S. v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020). In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19. Id. Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail. See U.S. v. Santiago Ramos, 20-CR-04 (ER).

Across the country, USDJ Robert C. Jones made the point quite simply when he wrote in *United States v. Barkman*, 3:19cr0052 (D-NV ECF Docket entry 21) on March 19, 2020:

> With 26 confirmed cases in Nevada, indicating community spread, we must take every necessary action to protect vulnerable populations and the community at large. The men and women incarcerated at Washoe County Detention Facility are a part of our community and all reasonable measures must be taken to protect their health and safety.

Recently, Judge Paul Englemeyer rejected the application of a sentenced prisoner to be released to a halfway house because Judge Englemeyer believed he lacked the legal authority to release a sentenced prisoner.[50] But indicating that he understands the significant public and private health considerations, he wrote the following:

---

[48] https://www.nytimes.com/2020/03/22/us/politics/coronavirus-rand-paul.html?searchResultPosition=1
[49] Ellen Gabler, States Say Some Doctors Stockpile Coronavirus Drugs, For Themselves, New York Times, (March 24, 2020) https://www.nytimes.com/2020/03/24/business/doctors-buying-coronavirus-drugs.html
[50] *United States v. Jones (Daniel Hernandez)*, 1:18-cr-00834-PAE (Docket entry 440, dated March 25, 2020)

13

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| **New York, New York 10007** | **New York, New York 10018** | **Tenafly, New Jersey 07670** |
| **Tel (212) 566-6213** | **Tel (212) 967-0352** | **Tel (201) 569-1595** |
| **Fax (212) 566-8165** | **Fax (201) 596-2724** | **Fax (201) 596-2724** |

At the time of sentencing, however, the Court did not know and could not have known that the final four months of Mr. Hernandez's sentence would be served at a time of a worldwide pandemic to which persons with asthma, like Mr. Hernandez, have heightened vulnerability. Section 3553(a) instructs a sentencing court to consider, inter alia, the "history and characteristics of the defendant" and "the need to provide the defendant with needed... medical care." 18 U.S.C. § 3553(a). Had the Court known that sentencing Mr. Hernandez to serve the final four months of his term in a federal prison would have exposed him to a heightened health risk, the Court would have directed that these four months be served instead in home confinement.

**2.     Mr. Martinez should be released until the crisis subsides in order to protect his Sixth Amendment right to counsel.**

The conditions of confinement at the WCJ have substantially diminished Mr. Martinez's Sixth Amendment right to the effective assistance of counsel. Until he is released, Mr. Martinez will continue to suffer violations of his constitutional rights and his ability to prepare for his defense.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice. As the Second Circuit emphasized in a decision handed down last week: "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." Federal Defenders of New York, Inc. v. Bureau of Prisons, Docket No. 19-1778 (2d. Cir. March 20, 2020). In recognition of this vital right, BOP regulations instruct that detention center wardens "shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis." 28 C.F.R. § 551.l 17(a).

A detention facility therefore violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001). Unreasonable interference requires a showing far less alarming than the one present here. In Benjamin, the Second Circuit held that New York City correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client." Benjamin, 264 F.3d at 179.

In Wolfish v. Levi, the Second Circuit held that the WCJ "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir. 1978), rev'd on other grounds, 441 U.S. 520 (1979). The shutdown of client visits makes the disconnect between client and counsel all the more pronounced.

14

As the public health crisis rapidly evolves, so too does the judiciary's perspective on release. On March 13, 2020, Chief Judge McMahon denied a motion for bond related to the coronavirus. On March 18, 2020, she reversed her decision and granted an application for bail based on compelling reasons related to the current health crisis. Defense counsel had argued that "[a] complete cessation of visits at this critical time of preparation would make it impossible to adequately prepare for trial…." U.S. v. Hudson, 19-CR-496 (CM) (Mar. 18, 2020).

Mr. Martinez remains innocent until proven guilty. To mount an effective defense at trial, Mr. Martinez should be released from custody. This extraordinary moment requires judicial intervention to safeguard Mr. Martinez's constitutional rights.

**3.     The Bail Reform Act contemplates Mr. Martinez's temporary release until the crisis ends for his safety and to ensure his right to counsel.**

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States Marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i). There is no greater necessity for the preparation of a "person's defense" than access to counsel. And there is no more "compelling reason" than the individual's physical health and the health and safety of the community.

In her decision last week, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)." U.S. v. Stephens, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community). See also U.S. v. Perez, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

In U.S. v. Rodriguez, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment. 2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.). The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'" Id.; cf. Falcon v. U.S. Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

With the Bureau of Prisons and WCJ on lockdown for the foreseeable future and some evidence that the wave of infections has crested but not yet abated, the only way to ensure Mr. Martinez's statutory and constitutional right to consult with client is to temporarily release him at this time. In the throes of this public health crisis, the Court should release Mr. Martinez to protect his physical health.

15

225 Broadway, Suite 715           505 Eighth Avenue, Suite 300                    Post Office Box 127
New York, New York 10007      New York, New York 10018                 Tenafly, New Jersey 07670
Tel (212) 566-6213                   Tel (212) 967-0352                            Tel (201) 569-1595
Fax (212) 566-8165                   Fax (201) 596-2724                           Fax (201) 596-2724

In a variety of similar applications in this District, the Government has made a variety of objections to applications for temporary release. Anticipating the arguments of the Government, I also offer the following:

1.      If the Government were to argue that "the Defendant does not allege that he has been personally exposed to coronavirus at WCJ", it is correct that Mr. Martinez does not yet have proof that this has happened.  Of course, once you have been exposed to the virus, the point of prevention will have been missed. Since the correctional facilities are not testing inmates until they show multiple symptoms of the illness, when they are at their most contagious, the opportunity will have been missed. There are several pharmacological protocols that are being tested now and which seem to be promising, and rely on early intervention with the patient.[51] Once an inmate has developed the full-blown virus and its symptoms and conditions, the opportunity will have been missed. And the ones who are directly tasked with caring for the yet-to-best-tested inmates, the corrections officers, the medical staff, and the civilian staff are themselves getting sick.[52]

2.      If the Government were to argue that the BOP and its agent WCJ have been planning for the global pandemic and its impact on the prisons for two months, their planning has been an abject failure. Chief Judge Colleen McMahon, Federal Defender Attorney in Chief David Patten, and Federal Defender Attorneys-in-charge Jennifer Brown and Deirdre Vondornum met with the Warden of MCC on March 12, 2020, the day before the facility shutdown to all visitors.  As of March 12, the MCC Warden said they were still waiting for guidance from national BOP, their immediate plan was that they could issue hand sanitizer to all the units once it was ordered and received, and that anyone who tested positive would be held at the hospital not at the jail. Ordering a couple jugs of Purell is not proof that BOP was prepared for this crisis.

3.      If the Government were to argue that "the Defendant does not give details about why his place on the outside will be better than WCJ", whatever level of socio-economic comfort Mr. Martinez will or will not have at home, it will be safer than in prison. If released, he will reside with family under house arrest, with electronic monitoring to insure that he does not leave. Further, he will not be going out because of the current order of sheltering-in-place by Gov. Cuomo. (*supra, at FN 11*) Additionally, if Mr. Martinez should become sick, he has a better

---

[51] Kai Kupferschmidt, Jon Cohen WHO Launches global Megatrial of the Four Most Promising Coronavirus Treatments, ScienceMag.com (March 22, 2020) https://www.sciencemag.org/news/2020/03/who-launches-global-megatrial-four-most-promising-coronavirus-treatments. *But see* Michelle Fay Cortez Malaria Drug Hydroxychloroquine No Better Than Regular COVID-19 Care, Bloomberg.com (March 24, 2020) https://www.bloomberg.com/news/articles/2020-03-25/hydroxychloroquine-no-better-than-regular-covid-19-care-in-study

[52] Cassidy McDonald, Federal Prison Say Conflicting Orders On Coronavirus Putting Their Lives At Risk, CBSNews.com (March 19, 2020) https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/I am further informed that numerous Marshals in SDNY and EDNY are also positive or symptomatic (10 Marshals in SDNY in quarantine; 4 Marshals in EDNY have tested positive, a CSO has tested positive, and many others are symptomatic and unable to come to work). What the status of the workforce for the non-transparent BOP is unknown.

16

**225 Broadway, Suite 715**
**New York, New York 10007**
**Tel (212) 566-6213**
**Fax (212) 566-8165**

**505 Eighth Avenue, Suite 300**
**New York, New York 10018**
**Tel (212) 967-0352**
**Fax (201) 596-2724**

**Post Office Box 127**
**Tenafly, New Jersey 07670**
**Tel (201) 569-1595**
**Fax (201) 596-2724**

chance at quality medical care with local hospitals than he would at the BOP or WCJ.[53] The BOP will isolate a sick patient until such time as condition deteriorates so much that he then has to be hospitalized in a *public hospital.* [54] Better to let a sick Mr. Martinez take himself to the hospital as necessary.

### Conclusion

Legitimate questions abound relating to the coronavirus and the best path to choose in fighting it. It is far from clear what to do in response to the global pandemic, on an institutional level, such as at the WCJ or the MDC, on a systemic level, like the BOP nationwide, or across a segment of society, like the criminal justice system or the City of New York, or for the world entire. What is requested in this case however is a choice to be made in just this one case, for Mr. Martinez. What is the best decision at this moment?

Releasing Mr. Martinez would allow him to self-isolate at home, away from other sick people. This is important because Mr. Martinez cannot be adequately protected at the Westchester County Jail because the jail is currently inundated with cases.[57] As of April 2, 2020, it was reported that "[a]t least 23 Westchester County Jail employees and six inmates have tested positive for the novel coronavirus."[58] By April 5, 2020, according to a government submission, those numbers jumped substantially with at least 24 inmates and 60 staff being diagnosed with COVID-19 and at least sixty-four staff members suspected of having the it.[59] Then on April 15, 2020, the government disclosed in an unrelated case that 53 inmates and 120 staff had been diagnosed with COVID-19.[60] This represents a jump in inmate infections at WCJ of over 700% and a jump of staff infections of over 400%, all in the matter of two weeks. This pace continues today.

Due to this crisis, the District Attorney of Westchester County has consented to the release of sixty-five convicted inmates. The release of prisoners was necessary, the District Attorney explained, because "[w]e try to balance the need to reduce the jail population *for health inside the jail.*"[61] Like the inmates serving state-sentences, releasing Mr. Martinez would enable the jail to focus its limited resources on treating others, and would protect the staff and inmates from potential exposure.

I respectfully ask the Court to protect Mr. Martinez's health and those around him, and to protect his constitutional right to counsel, due to the threat incarceration poses to Mr. Martinez's physical well-being. As the Second Circuit recently opined, "the careful balancing of needs and rights that [ ] emergencies require is likely not best achieved by protracted and contentious litigation after the fact, and certainly not at the appellate level. It requires real-time,

---

[53] Jennifer Gonnerman, A Rikers Island Doctor Speaks Out to Save Her Elderly Patients From the Coronavirus, The New Yorker (March 20, 2020) https://www.newyorker.com/news/news-desk/a-rikers-island-doctor-speaks-out-to-save-her-elderly-patients-from-the-coronavirus

[54] M. Licon-Vitale, Warden "Memorandum For All MCC New York Staff" https://mobile.twitter.com/keegan_hamilton/status/1242226507759509504

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |

comprehensive solutions, reached in cooperative institutional discussions." <u>Federal Defenders of New York, Inc. v. Bureau of Prisons</u>, No. 19-1778 (2d. Cir. March 20, 2020) ("direct[ing] the District Court [to help] ensure that the Federal Defenders have meaningful, continuous access to their clients either in person or by remote access pending adjudication of [legal claims against the MDC, including Sixth Amendment violations] as these claims may be amended to address similar issues of access [to counsel] arising during the current public health emergency [COVID-19]").

Accordingly, I respectfully request that the Court issue an order releasing Christopher Martinez  on home incarceration with electronic monitoring and whatever additional conditions as the Court sees fit for the duration of the COVID-19 crisis. I thank the Court for its consideration.

Respectfully submitted,

_____s/ Sam Braverman_____
Samuel M. Braverman, Esq.
Fasulo Braverman & Di Maggio, LLP
225 Broadway, Suite 715
New York, New York 10007
Tel. 212-566-6213

Cc:     AUSA Christopher Brumwell (BY ECF and email)

        David Patton, Attorney-in-Chief, Federal Defenders (by email)

Mr. Martinez references his high blood pressure and diabetes and the Government assertrs that Mr. Martinez has no medical conditions that uniquely pose a risk to him from COVID-19.  The Parties are directed to discuss the matter and present to the Court any medical records that identify any particular health issues that Mr. Martinez suffers from that place him in a higher risk category.  Any follow-up letters are due by 4/28/20.

So Ordered.

4/24/20

| 225 Broadway, Suite 715 | 505 Eighth Avenue, Suite 300 | Post Office Box 127 |
|---|---|---|
| New York, New York 10007 | New York, New York 10018 | Tenafly, New Jersey 07670 |
| Tel (212) 566-6213 | Tel (212) 967-0352 | Tel (201) 569-1595 |
| Fax (212) 566-8165 | Fax (201) 596-2724 | Fax (201) 596-2724 |